# Report of D. D.
## Written Explanation of Proposals

### I. Introduction

My initials are D. D.[1], and I am an Alabama resident and a student at the University of Alabama. This Report aims to assist the Team in the evaluation and selection of remedial State Senate plans for the Court's consideration. Namely, my Report seeks to explain my proposed remedial districts: how they were developed, how they remedy the violation of Section 2 of the Voting Rights Act, how they best adhere to the Legislature's stated guidelines and policy choices, and how they comply with the Court's order of October 1, 2025.

### II. Background

On August 22, 2025, this Court issued its Order holding that Alabama's State Senate redistricting plan violates Section 2 of the Voting Rights Act of 1965. More specifically, the Court held that the Montgomery-area State Senate districts illegally dilute the voting power of Black voters by providing only one district in which Black voters are able to elect a candidate of their choice. Determining that the appropriate remedy would be "an additional district in the Montgomery area in which Black voters either comprise a voting-age majority or something quite close to it," the Court provided time for the Legislature to enact a remedial districting plan. Governor Kay Ivey ultimately opted against calling the Legislature into session, thus foreclosing the possibility of a legislatively-drawn remedy.

With the Legislature having failed to enact a lawful redistricting plan, the "unwelcome obligation" of imposing such a plan now shifts to this Court. In its October 1 Order, the Court appointed Richard F. Allen and David R. Ely to serve as Special Master and Expert Cartographer, respectively, and directed them to commence work on devising and recommending three such plans for the Court's consideration no later than October 24. On October 2, the Special Master issued an order, directing parties and any interested persons to file their proposed plans for the Special Master's consideration by midnight, Thursday, October 9.

### III. Governing Law

    A.   Federal Constitutional and Statutory Requirements

Every ten years, states are tasked with redrawing electoral boundaries, adjusting for population changes as captured by the decennial Census. Longstanding Supreme Court precedent surrounding the Equal Protection Clause mandates that electoral districts must be approximately equal in population. Although not at issue here, the Equal Protection Clause also prohibits racial gerrymandering and intentional discrimination within redistricting.

    B.   State Constitutional Requirements

Redistricting for the Alabama Senate is provided for under the Alabama Constitution. Section 200 of the Alabama Constitution provides for the Legislature to reapportion the state into Senate districts immediately following the decennial census, and goes on to state that "no county may be divided into two districts." Although the precise text has been rendered a nullity

---

[1] Name withheld per Fed. R. Civ. P. 5.2

due to federal constitutional requirements, the clause still functions as a directive to minimize county splitting in the enactment of a Senate redistricting plan.

### C. The Legislature's Guidelines

The Legislature's Joint Committee on Reapportionment maintains a set of self-imposed discretionary guidelines to assist the body in the enactment of redistricting plans. Largely mirroring federal law, the guidelines state that any plan must consist of substantially equal districts. Additionally, districts should strive to protect communities of interest, preserve the cores of existing districts, and minimize the number of counties in a district.

### D. This Court's Order

This Court's October 1 Order outlines the criteria the Special Master is to follow in the recommendation of redistricting plans. Any map shall remedy the violation of Section Two of the Voting Rights Act, by remedying the unlawful dilution of Black voting power in the Montgomery area. The Court remarked that the plan must "include an additional district in the Montgomery area in which Black voters either comprise a voting-age majority or something quite close to it." Additionally plans must comply with the Voting Rights Act of 1965 and the U.S. Constitution; achieve strict compliance with one-person, one-vote by minimizing population deviation; respect—to the extent practical—the expressed traditional redistricting guidelines as set forth by the Reapportionment Committee; and "hew as closely as possibly to the Enacted Plan while providing a lawful remedial district in the Montgomery area." The Special Master is additionally prohibited from considering partisan data and incumbency in redrawing the districts.

With these in mind, I now turn to my proposed remedial proposals.

## IV. Remedial Proposals

Alongside this Report, I submit 6 remedial plans for the Court's consideration: Plans 3.0, 3.2, 4.0, 4.2, 5.0, and 5.2. Each plan was designed to remedy the illegal vote dilution, while complying fully with this Court's order.

I discuss how they achieve compliance as such.

### A. One-person, one vote

At the 2020 census, Alabama reported a population of 5,024,279. Divided into 35 districts, the ideal population for a Senate district is exactly 143,550. In the 2021 plan, districts 25 and 26 are overpopulated, containing 4,249 and 4,899 more people than the ideal, but still nonetheless within the ±5% acceptable range for a legislatively-enacted plan. District 30, likewise, is underpopulated by 7,156. Because any redraw would consist exclusively of these districts, an analysis of population equality must begin and end with the deviation *between* these districts. To do so, we must determine the ideal population of a district, for two sets of districting configurations: one in which only districts 25 and 26 are rearranged, and another in which district 30 is also reconfigured. We'd start by adding the population between the Enacted Plan districts being altered, and then divide by the number of districts being altered.

Holding all other districts constant, we arrive at the following calculations: in any configuration that leaves only districts 25 and 26 altered, drawing two districts to a level of exact population equality would leave us with two districts consisting of exactly 148,125 people. And in any configuration in which District 30 is altered, and to the extent necessary to achieve precise compliance with one-person, one-vote, we're left with 3 districts of exactly 144,215 people. **All six of my plans achieve exact population equality between the affected districts, within a deviation of ±1 from the ideal number**.

  B. Compliance with the U.S. Constitution and the Voting Rights Act

My plan is compliant with the Constitution and remedies the illegal vote dilution taking place in the Montgomery area. I did not use racial and/or partisan data in the process of drawing my plans; thus, in no way did race predominate in the drawing of my redistricting plans. Racial data did not appear on screen as I drew my maps, nor did any partisan data. I focused on retaining the population cores of each district, minimizing the amount of changes between districts to the extent possible, and drawing districts that were compact, contiguous by road, and representative of communities of interest in the Montgomery area.

When I finished each of my plans, I observed the racial make-up of each completed district and the performance of White and Black-preferred candidates in 15 elections between 2016 and 2024. I can quite comfortably opine that every remedial plan provides two districts in which Black voters have an opportunity to elect a candidate of their choice. In fact, in the majority of my plans, Black voters will more often than not successfully elect a candidate of their choice in both districts.

  C. Legislative Guidelines and Least Necessary Changes

All six of my plans comply with the Legislative Guidelines, and they "hew as closely as possibly to the Enacted Plan while providing a lawful remedial district in the Montgomery area." In the process of drawing my plans, all districts save for the ones being redrawn were locked. In all plans not ending ".2", only Districts 25 and 26 are reconfigured. In those ending in ".2", District 30 experiences the minimal necessary changes required to bring the three districts into strict compliance with one-person, one vote.

The District 30 split, while engineered to achieve strict compliance with one-person, one-vote, also adheres to the Legislature's determinations as to what constitutes a community of interest when splitting Elmore County. To the extent that splitting Elmore County is necessary to achieve population equality in the Enacted Plan—and to the extent that splitting more of it into District 30 is necessary to achieve even tighter population equality—the Legislature determined to split western Elmore County into District 30, while placing the balance of the county in a district anchored to Montgomery (in the enacted plan, District 25). My plans place as much of Elmore County into one district as possible; half of my plans leave District 30 untouched, while the other half place a few more rural communities of western Elmore County into District 30, not unlike how the Legislature drew a number of such communities into the District.

My plans also place the majority of Elmore County—the entirety of the county not in District 30—in District 26. The addition of Elmore County is necessary to remedy the illegal vote dilution identified by the Court. By adding Elmore to District 30, District 25 must acquire a number of Montgomery-area precincts in order to achieve population equality; in doing so, District 26 becomes an additional Black-opportunity district. Like the Enacted Plan, all portions of Elmore County not located in District 30 are placed into a predominantly-Montgomery County District. The situation is similar for smaller Crenshaw County, although no alterations necessary there to remedy the violation.

My plans in the Montgomery area also "hew as closely as possibly to the Enacted Plan." In drawing these plans, in drawing each of these districts, precincts were only moved from one district to another to the extent necessary to remedy the violation[2]. When drawing, I would generally place the entirety of Elmore County—save for those portions in District 30—in District 26. District 26 would be overpopulated as a result, and District 25 would similarly be underpopulated. District 25 would thus be forced to acquire a large number of Alabamians located in Montgomery from District 26, and in the process become a district in which Black Alabamians consist of a significantly higher percentage of the district's population compared to the enacted plan.

In the process of drawing districts, I complied with the Legislature's guidance on protecting political subdivisions. In the process of drawing my plans, I split precincts only as necessary to achieve exact population equality between districts. Additionally, although splitting the City of Montgomery is necessary due to the geography of the affected districts, I made an effort to avoid splitting any additional cities in my mapdrawing process. In the drawing of Remedial Plans 3.2, 4.2, and 5.2, I added several uninhabited blocks from a precinct primarily located in District 30 into District 26. The precinct had already been split to achieve population equality, and by splitting this small unpopulated portion into District 26, I was able to keep the City of Wetumpka entirely within District 26.

V. **Conclusion**

In conclusion, I have submitted six proposed Remedial Plans for the Special Master's consideration. Each plan consists of compact, equally populated districts, and are drawn in a party-blind, race-blind, incumbent-blind manner. Each district has only been altered to the extent necessary to achieve equality of population and to remedy the identified dilution of the votes of Black Alabamians. I would like to thank the Special Master Team for the opportunity to submit my Plans alongside this Report, and I would appreciate any consideration of my plans for the Special Master's recommendation.

Thank you.

---

[2] Plans 5 and 5.2 place a slightly higher emphasis on compactness relative to core retention.